Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br>**Saturno Design, LLC,**<br>　　　　Debtor. | Case No. 23-31455-dwh11<br><br>MEMORANDUM DECISION ON T BANK'S PLAN-CONFIRMATION OBJECTION[1] |

## I.　Introduction

On August 30 and 31, 2023, I held an evidentiary on T Bank's objection to confirmation of the chapter 11 plan proposed by debtor, Saturno Design, LLC.

For the reasons below, I will deny confirmation—but for two, fixable reasons.

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

Page 1 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

## II.  Background

The plan noticed to creditors was the first amended plan.[2] Saturno filed a second amended plan on August 29, 2023.[3] When addressing the bank's objections, my references to the plan will be to the amended plan.

Plan section 2.2 states that the current amount Saturno owes the bank is $1,078,428.16. The bank's secured claim is defined in section 1.71 and treated in section 4.1. Section 1.71 defines "T Bank's Secured Claim" to mean a secured claim in the principal amount of $603,205, which it asserts is the value of the bank's collateral, with interest at the federal prime rate in effect on the petition date plus 1 percent, which by confirmation would become an allowed secured claim in the amount of $603,205. Section 4.1.b gives the bank an allowed secured claim as of the plan's effective date of $603,205. Section 4.1.c requires monthly installment payments followed a balloon payment in December 2030.

In an order establishing procedures, I set seven days before the hearing as the deadline for filing proposed exhibits and lists of exhibits and witnesses. The order also said that, except for good cause shown, no unlisted witness would be permitted to testify, and no unfiled and unlisted exhibit would be

---

[2] ECF No. 39.
[3] ECF No. 67.

received in evidence at the hearing.[4] The bank filed its exhibits and exhibit and witness lists at 5 p.m. on August 28.[5]

### III. Discussion

This case is under subchapter V. Because the plan impairs both classes treating the bank's claims and the bank has not accepted the plan, the plan can be confirmed, if at all, only under 11 U.S.C. § 1191(b). That section requires that the plan satisfy the applicable requirements of 11 U.S.C. § 1129(a), other than paragraphs (8), (10), and (15), if the plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired nonaccepting class. Here, the bank challenges the plan's compliance with 1129(a)(1) and (3) and the fair-and-equitable requirement of 1191(b).

#### A. *1129(a)(1): compliance with title 11*

Section 1129(a)(1) requires that a plan comply with applicable provisions of title 11. The bank argues that the plan's attempts to value its collateral and determine the allowed amount of its claim conflict with 11 U.S.C. §§ 502 and 506. I adhere to the conclusions I reached at the hearing: (1) the plan cannot effect allowance of the bank's claim, whether secured or unsecured; (2) but plan confirmation can determine the value of a creditor's collateral; and (3) because the bank does not yet have an allowed claim, a collateral-valuation decision would be transmuted into the amount of the bank's secured claim if it obtains an allowed claim, such as by filing a proof of claim.

---

[4] ECF No. 36 at 3 ¶¶ 3, 4.
[5] ECF No. 66.

Page 3 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

### B. 1129(a)(3): good faith

1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law. The bank argues that Saturno did not propose the plan in good faith because it seeks to determine the collateral value through plan confirmation and because Saturno requests a collateral valuation that the bank contends is substantively insufficient.

Above, I decided that plan confirmation can determine the collateral value. The bank did not argue that Saturno's proposed collateral valuation was unwarranted by existing law or lacked any evidentiary support. In any case, based on the evidence and argument I heard, I find that Saturno did not act in bad faith by making its plan-based collateral-valuation proposal.

### C. 1129(a)(11) and 1191(c)(3): feasibility

Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless proposed in the plan. The Ninth Circuit has held that a plan is feasible under 1129(a)(11) if it "has a reasonable probability of success."[6] That court has also held that the purpose of the feasibility requirement "is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[7] The Ninth Circuit

---

[6] Acequia, Inc. v. Clinton (*In re* Acequia, Inc.), 787 F.2d 1352, 1364 (9th Cir. 1986).
[7] Pizza of Haw., Inc. v. Shakey's, Inc. (*Matter of* Pizza of Haw., Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985).

Page 4 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

Bankruptcy Appellate Panel has held that, when a plan turns on sale or refinancing of collateral, satisfaction of the "reasonable probability" standard requires that the bankruptcy court "determine whether a sufficient refinancing or sale is reasonably likely to occur . . . ."[8] The BAP has also held that a debtor need not "prove that success is inevitable."[9]

In a subchapter V case in which an impaired class rejects the plan, as here, the plan must also satisfy the separate feasibility requirement in 1191(c)(3) as to that class. That section allows feasibility to be satisfied in either of two ways. First, 1191(c)(3)(A) allows the debtor to show that it will be able to make all payments under the plan. Alternatively, 1191(c)(3)(B) allows the debtor to show both that there is a reasonable likelihood that the debtor will be able to make all payments under the plan and that the plan provides appropriate remedies to protect creditors if payments are not made.

In the bank's objection, it questioned Saturno's failure to provide details of its strategy or to show its ability to obtain refinancing to make the balloon payment. Saturno principal Rodolfo Bozas testified that he has obtained financing in the past for other businesses he has run and is aware of the factors used by lenders and, if Saturno is showing positive revenue year-over-year, it should be able to get the required refinance. (Because he and co-principal Cristina Bozas share a last name, I will refer to them by their first

---

[8] Hamilton v. Curiel (*In re* Curiel), 651 B.R. 548, 567 (9th Cir. B.A.P. 2023).
[9] Comput. Task Grp., Inc. v. Brotby (*In re* Brotby), 303 B.R. 177, 191 (9th Cir. B.A.P. 2003).

Page 5 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

names; and because Saturno refers to Rodolfo as Rudy, I will do so as well.) Francisco Arguelles, Saturno's outside certified public accountant, testified that the prospects for refinancing the bank's loan by 2030 are "credible and reasonable." Saturno's evidence was not overcome by the bank's, which suggested only that Saturno might be unable to refinance with a Small Business Administration loan or at the best rates offered by other lenders.

The bank also questioned whether the plan, if feasible with the payment to the bank on account of its secured claim at $603,205, would remain so if that amount were increased—such as to $747,600, the amount I find below to be the collateral value. Because the plan proposes fixed preballoon payments on the bank's secured claim, increasing the collateral value would increase only the balloon amount. As I discuss below, Arguelles testified both that the collateral value was $747,600 and that the prospects for refinancing the bank's secured claim by 2030 are credible and reasonable. I thus cannot find from this confirmation record that increasing the bank's collateral value would destroy the plan's feasibility.

I find that Saturno satisfied its burden of proving that the refinancing is reasonably likely to occur.

The bank's objection briefly questions whether the plan satisfies the 1191(c) requirement that "there [be] appropriate remedies for default."[10] The bank doesn't address the default remedies that do appear in plan section 6.10

---

[10] ECF No. 58 at 6:23–7:2.

Page 6 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

or explain how those remedies are not appropriate. And the bank didn't address plan remedies at the hearing.

The plan need not satisfy 1191(c)(3)(A), and the 1191(c)(3)(B)(i) requirement of a "reasonable likelihood" that all plan payments will be made is indistinguishable from the 1129(a)(11) requirement of a "reasonable probability of success" of the plan. The bank does not argue otherwise or even specifically address 1191(c)(3)(B)(i).

I find that the plan satisfies the feasibility requirements of both 1129(a)(11) and 1191(c)(3).

### D. *1191(c): fair and equitable*

The elements that must be satisfied for a plan to be fair and equitable are in 1191(c). The bank challenges the plan's satisfaction of the requirement of 1191(c)(1). Above, I addressed and rejected the bank's challenge to the plan's satisfaction of the feasibility requirement of 1191(c)(3).

Section 1191(c)(1) requires that the plan satisfy the secured-claim cramdown requirement of 1129(b)(2)(A). Under that paragraph, a secured claimholder must receive deferred cash payments of at least the value of the collateral. The bank challenges the plan's collateral valuation and interest rate.

#### 1. Collateral value

##### (a) *Saturno's value evidence and argument*

To support its position on collateral value, Saturno relies on the testimony of Arguelles, which was given without objection by the bank. In Exhibit 7,

Page 7 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

Arguelles's August 22, 2023, letter report, he explains his view of the collateral value. He attached to the report a computation in a two-page spreadsheet. The sheet calculates Saturno's 2023 earnings before interest, taxes, depreciation, and amortization—its EBITDA. The calculation is based on actual figures for the first six months of the year and estimates for the last six months. For each month, the sheet calculates values including gross profit, total expense, net ordinary income, net other income, and "adjustments, add backs, and nonrecurring" items. The sheet concludes that Saturno's estimated 2023 EBITDA will be $182,171.22.

Arguelles applied two valuation approaches: the market and income approaches. To apply the market approach, he first applied a 3 percent growth rate to the 2023 EBITDA, resulting in 2024 EBITDA of $187,636. He then applied a multiple of 3.8, resulting in a value of $713,017. In the report, he also refers to the market approach as the "price to EBITDA."

To apply the income approach, he started with forecast discretionary earnings of $274,901, which is EBITDA plus the replacement salary reduction of $92,730. To that amount he applied a 3 percent growth rate, resulting in 2024 discretionary earnings of $283,148. He then applied a capitalization rate of 36.2 percent, resulting in a value of $782,177.

Arguelles testified that Saturno's income-statement projections are reasonable and fair and that he stands behind Exhibit 7. He concludes that

Saturno's value is $747,600, the average of the two value numbers, rounded up to nearest $10.

Arguelles also compared his analysis and conclusions with those in a value-calculation report prepared by GCF Business Valuation, which the bank filed. Arguelles identified similarities and differences between his analysis and GCF's. He said he used the same methodology—specifically the same EBITDA multiple of 3.8 in applying the market approach and the same capitalization rate of 36.2 percent in applying the income approach. Although his forecast 2023 revenue of $939,475 exceeds GCF's of $913,788, his estimated EBITDA is less than GCF's.

The most notable reason for the two reports' different EBITDA projections is how they account for the replacement salary for one of the key management positions. GCF used $65,000, but Arguelles used $92,730, which he justified in the report as the minimum appropriate salary based on the knowledge, skills, and abilities required for the position. In his report, he supported the $92,730 figure by reference to statistics issued by the federal Bureau of Labor Statistics. According to that source, the mean annual wage in Oregon for a Project Management Specialists is $92,730; that amount is less than it is in most other parts of the United States.[11] In his testimony, he explained that the salary at issue is that of Cristina, who oversees all creative application and redesigning of web pages and software.

---

[11] ECF No. 61-7 at 6.

Page 9 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

In Arguelles's report, he also disagreed with GCF's figures for add-backs for depreciation and amortization and nonrecurring expenses. The Saturno-generated income statement on which he relied did not include any expense for depreciation and amortization, so it was improper to include any add-back for depreciation and amortization. And GCF's add-back of $88,500 for what it thought were nonrecurring legal expenses,[12] exceeded the $60,000 amount that Saturno incurred in the first half of 2023, the amount Arguelles used.[13]

Arguelles and Rudy's testimony also supported inclusion in Saturno's May 2023 expenses, and thus in its projected future annual expenses, of $19,358.07 for "accounting." Although that amount was mostly attributable to applying for COVID-19-related employment tax credits, which presumably would not recur, there could be other future one-off accounting expenditures, and in any case, Saturno does not, but should according to them, otherwise have any budget item for bookkeeping or accounting services.

In Arguelles's testimony, he addressed other differences between GCF's income statement for the first half of 2023 and the figures for that period in the income statement he prepared. Saturno prepared and attached to its petition, filed on July 3, 2023, an income statement that bore the heading "January through June 2023," but it also showed that it was generated on June 29, 2023.[14] In GCF's report, it used the figures from the petition as

---

[12] ECF No. 66-2 at 14 (document at 13, ex. at 14).
[13] ECF No. 61-7 at 4:6167.
[14] ECF No. 66-1 at 41–42.

Page 10 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

Case 23-31455-dwh11    Doc 79    Filed 09/13/23

Saturno's internal income statement through June. As Arguelles explained, an income statement generated before month end would reflect neither items occurring later in that month nor any adjustments made before that month's accounting had been closed. Rudy's testimony supported that explanation.

Arguelles treated 2023 as the base year for projecting revenue. By contrast, GCF appears to have considered in some way Saturno's revenue for prior years, as well as 2023. I accept the explanation of Rudy and Arguelles that extraordinary revenue reductions caused by COVID-19 from 2020 through 2022 make it appropriate to exclude those years in making plan projections.

### (b) *Bank's value evidence and argument*

The bank's witness was Robert Woodard, its chief credit officer. Because the bank did not timely file a witness list, Saturno objected to Woodard's testimony. I allowed Woodard's testimony—only to rebut Saturno's evidence; I sustained the objection to any nonrebuttal testimony by Woodard. For reasons I stated on the record at the hearing, the bank has not shown cause to relieve it of the deadline to identify Woodard as a witness for any case-in-chief evidence.

Saturno also objected to Woodard providing testimony as a valuation expert. I took that objection under advisement and allowed Woodard to testify to value. He has experience and has received training about performing internal collateral valuations for the bank and other lenders for

which he has worked. In doing so, he applied what he called internal valuation models at each lender, using various factors. But he did not explain how he performed the bank's internal valuation, he provided no written report of the bank's valuation, and he referred mostly to the GCF report, so his valuation knowledge did not help me understand the evidence or determine the value of the bank's collateral. I now determine that his value testimony is inadmissible under Federal Rule of Evidence 702. Even if I were to admit it for that purpose, I would discount it for the same reasons that I exclude it as expert value evidence.

The bank also sought to have the GCF report admitted in evidence. It made that request during both its cross-examination of Arguelles and its direct examination of Woodard. Saturno objected, both because no author of the GCF report testified, making the report hearsay, and because the report was filed after the exhibit-filing deadline.

For the same reason that I found no cause to relieve the bank from the witness-list filing deadline, I find no cause to relieve it from the exhibit-filing deadline—but only to the extent the bank would offer exhibits in support of its case in chief. I overruled the objection and admitted the GCF report to the extent Arguelles relied on it in his report or testimony, making it the proper subject of rebuttal evidence.

Since the hearing, I have concluded that Arguelles did not rely on the GCF report; his references to it were only to rebut it. So his references to it do

not make any portion of it admissible. And no part of Woodard's testimony made the GCF report admissible. He did not testify that he based his opinion on facts or data in the GCF report. Indeed, he testified that the bank formed its own opinion and then engaged GCF to validate that opinion. I will disregard the GCF report.

### *(c)* *Value conclusion*

I accept Arguelles's testimony that the bank's collateral is worth $747,600. The plan, if modified to pay the bank that amount on account of its secured claim, would satisfy the cramdown requirement to pay the bank the collateral value.

### 2. Interest rate

### *(a)* *Till v. SCS Credit Corp.*

Both the bank and Saturno point to the Supreme Court's 2004 decision in *Till v. SCS Credit Corp.*[15] That case involved a chapter 13 plan that paid 9.5 percent on a loan undersecured by a pickup worth $4,000.[16]

The plurality opinion adopted what it called the "formula approach."[17] It "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively

---

[15] 541 U.S. 465, 480 (2004).
[16] 541 U.S. at 470–71.
[17] 541 U.S. at 478.

slight risk of default."[18] The bankruptcy court must hear evidence on and adjust the rate to reflect the typically greater risk of nonpayment posed by bankruptcy debtors than solvent commercial borrowers. The amount of the risk adjustment depends on factors such as the "circumstances of the estate" (which I take to mean the nature of the debtor, including its assets and financial prospects), the nature of the security (the collateral), and the duration and feasibility of the plan. "Some" evidence of the appropriate adjustment "will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense." Starting from a "concededly *low* estimate and adjusting *upward*" places the evidentiary burden "squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the 'liquidity of the collateral market . . .).'"[19] The Court also thought that "many of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise." The formula approach, according to the Court, "entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings."[20]

---

[18] 541 U.S. at 478–79.
[19] 541 U.S. at 479 (italics in original).
[20] 541 U.S. at 479.

Page 14 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

In adopting the formula rate, the Court considered and rejected three other rates, including the "coerced loan rate."[21] That is the rate that "the creditor could obtain from new loans of comparable duration and risk."[22] Determining it requires bankruptcy courts to "consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors—an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans."[23]

In selecting among the several approaches, the Court thought that "Congress would favor an approach that . . . minimizes the need for expensive evidentiary proceedings."[24]

Although the Court did not decide the "proper scale for the risk adjustment," it did observe that "other courts have generally approved adjustments of 1% to 3%." The creditor argued that an adjustment "in this range" (1 to 3 percent) is "entirely inadequate" to reflect for the "real" risk of plan failure. The Court declined to resolve that dispute, but found it "sufficient for our purposes to note" two counterarguments: the failure rate for approved (confirmed) chapter 13 plans is "much lower" than 60 percent, and a plan cannot be confirmed without the 1325(a)(6) feasibility finding, which, with the cramdown provision, "obligates the court to select a rate high

---

[21] 541 U.S. at 473.
[22] 541 U.S. at 477 n.15.
[23] 541 U.S. at 477.
[24] 541 U.S. at 474–75.

enough to compensate the creditor for its risk but not so high as to doom the plan."[25] Congress intended that confirmed plans "have a high probability of success."[26] If the risk of default is so high as to require an "eye-popping" rate, "the plan probably should not be confirmed."[27]

### (b)  Bank's interest-rate evidence and argument

Both Saturno and the bank treated the *Till* formula approach as determinative of the cramdown interest rate for the bank's secured claim. Because the bank has the burden of establishing the appropriate risk adjustment, I will address its evidence and argument first.

In challenging the sufficiency of Saturno's proposed 1 percent risk adjustment, the bank points to the nature of its collateral, which is largely Saturno's revenues, accounts receivable, and other intangibles. It also observes that the collateral value derives from the value of Saturno's business as a going concern.[28] That position aligns with Saturno's evidence of the collateral value, which rested on its projected revenues. In the bank's written objection, it argued that if Saturno's profits and income decrease, disabling it from making plan payments, the value of the collateral "will likely suffer." The bank calls that a "significant risk factor [that] supports a

---

[25] 541 U.S. at 480.
[26] 541 U.S. at 482.
[27] 541 U.S. at 480–81.
[28] ECF No. 58 at 9:1–4.

Page 16 – MEMORANDUM DECISION ON T BANK'S PLAN etc.

higher margin of interest of 2.5% over the prime rate as set forth in the Bank's loan documents."[29]

As evidence adduced at the hearing, the bank relied on its contract rate of prime plus 2.5 percent, Rudy's testimony that no one had offered Saturno prime plus 1 percent as a refinance rate, and Woodard's testimony that Saturno's failure to pay fully an SBA-guaranteed loan (as the bank's is) would prevent Saturno from obtaining another such loan and that Saturno's bankruptcy would prevent Saturno from obtaining the best rates from non-SBA lenders. In closing argument, the bank argued for a plan interest rate at "the higher end" of the prime plus 1 to 3 percent scale.

### (c) *Saturno's interest-rate evidence and argument*

In support of its proposed 1 percent risk adjustment, Saturno relies on evidence of the plan's feasibility and *Till*'s allocation of the burden of proof on the risk adjustment to the bank.

### (d) *Interest-rate conclusion*

In applying the formula approach, *Till* bars consideration of the contract rate or market rates.

The bank's argument that the collateral would depreciate if revenues are less than projected does address a permissible formula-approach factor: the nature of the collateral. But the bank offered no evidence that Saturno's revenues are more likely to decrease than increase from its projected

---

[29] ECF No. 58 at 9:4–7.

revenue; in fact, I heard evidence that the projections are conservative. The bank also observes that the collateral is intangible; but, again, the bank offered no evidence that, either as a general matter or in this case, intangible property is more likely than tangible property to depreciate, rather than appreciate.

The other permissible factor addressed by the bank is the plan's feasibility. I have determined that the plan satisfies the "reasonable probability of success" standard for feasibility. In any case, the bank's feasibility evidence did not address the risk of default before the balloon payment is due. Instead, that evidence demonstrated, at best, that Saturno might be unable to refinance the balloon payment at favorable SBA rates, but not that the unavailability of those rates would materially reduce the likelihood of refinancing.

The only derogatory evidence the bank offered addressed plan feasibility, questioning whether Saturno could refinance in seven years, at least at a favorable SBA interest rate. I accepted Saturno's evidence that it could refinance and that the plan is feasible, and the bank offered no other evidence of the probability that Saturno's revenue will be materially less—or less at all—than the amount projected.

The burden of proof on risk adjustment that *Till* allocates to creditors has been explained in the Ninth Circuit's 2017 decision in *Sunnyslope Housing*

*Limited Partnership*[30] as the "burden of showing that the prime rate does not adequately account for the riskiness of the debtor." Here, the bank has not carried its burden of proving that Saturno's proposed 1 percent risk adjustment above prime is insufficient.

Based on the evidence on which I found that the plan satisfies the feasibility requirements of 1129(a)(11) and 1191(c)(3)(B)(i), I further find that any feasibility concern does not warrant a greater adjustment above prime than the 1 percent proposed by Saturno.

I find that the plan's interest rate to be paid to the bank would give the bank the present value of its secured claim.

## IV. Conclusion

The plan is unconfirmable for two, fixable reasons. First, Saturno must excise the claim-allowance language in the final phrase of section 1.71, "and which, by confirmation of the Plan, shall become an Allowed Secured Claim in the amount of $603,205.00," and all of section 4.1.b., entitled "Allowance." Second, the amount the plan proposes to pay the bank on account of its secured claim must be $747,600. The plan is otherwise confirmable.

In Saturno's second amended plan, it changes the first amended plan by removing references to exculpation in sections 1.29 and 9.4 and limiting an injunction in section 9.2. Those changes do not detrimentally affect any

---

[30] First S. Nat'l Bank v. Sunnyslope Hous. Limited P'ship (*In re* Sunnyslope Hous. Ltd. P'ship), 859 F.3d 637, 646 (9th Cir. 2017).

creditor, so they may be included in the plan without separate notice to and opportunity for creditors to object.

Saturno may lodge a confirmation order consistent with this decision. As a reminder, the order should comply with Federal Rule of Bankruptcy Procedure 3020 and LBR 3020-1(b)(1) and conform to Official Form 315 (2/20). The order should not contain any findings of fact or conclusions of law.

# # #